**STADIUM AUTHORITY**

**STATUTORY CONSTRUCTION – STATUTORY BAR TO TEAMS
      COMPOSED OF TOO FEW PLAYERS WITH RECENT
      MAJOR LEAGUE EXPERIENCE DOES NOT APPLY WHEN
      THERE IS NO PLAYERS' STRIKE**

May 12, 1995

*Mr. Richard A. Montgomery, III*
*Deputy Legislative Officer*

On behalf of the Administration, you have requested our opinion concerning Chapter 6 (Senate Bill 719) of the Laws of Maryland 1995, "Professional Baseball – Camden Yards." Pointing out that the law was enacted in the midst of the major league baseball strike, you ask whether the law's prohibition on the use of Camden Yards by teams with too many new players must be applied, although the strike is now over.

For the reasons stated below, we conclude that Chapter 6 is not applicable to games played when there is no baseball strike.[1]

**I**

**Background**

Senate Bill 719 was signed into law on March 27, 1995. As an emergency measure, the bill became effective immediately. At that time, the union representing major league baseball players was on strike, and the team owners had announced an intention to play a full schedule with "replacement players" – former major league players,

---

[1] You also posed a second question, about the consequences if the bill were applicable and yet the Maryland Stadium Authority failed to enforce it. In light of our answer to your first question, we need not consider the second.

minor league players, semi-professional players, and anyone else who could be signed to fill out a roster.[2]

Chapter 6 amended the law governing the Maryland Stadium Authority by imposing the following prohibition: "Notwithstanding any other provision of this subtitle, the Authority shall prohibit a major league professional baseball team from playing baseball in a stadium in Camden Yards if fewer than 75% of the players on the team's current 40-player major league roster were on the 40-player major league roster of a professional team in major league baseball at any time in the preceding calendar year." §13-723(b) of the Financial Institutions ("FI") Article, Maryland Code.

In early April, after Chapter 6 became effective, the players' union called off the strike.[3] The Orioles and the rest of the major league teams are playing their regularly scheduled games. Each team has filled its roster with what it considers the best available players.

According to at least one press report, the Detroit Tigers have so many players without the requisite major league experience that the team fails to meet the criterion in FI §13-723(b). We do not know whether this report is accurate. For purposes of this opinion, however, we shall simply assume that it is and proceed to the legal question: Does FI §13-723(b) require the Stadium Authority to bar the Tigers from playing in Oriole Park at Camden Yards?[4]

---

[2] With the important exception of the Baltimore Orioles, the teams had already fielded replacement players during spring training.

[3] The union did so after a federal court found that the owners had engaged in unfair labor practices. The owners and the union have not reached a collective bargaining agreement, however, and the strike could conceivably be resumed at some point in the future.

[4] The Tigers and Orioles have a three-game series at Camden Yards beginning May 16, 1995.

## II

### Interpretation of Chapter 6

In interpreting Chapter 6, we apply the principles of statutory construction frequently reiterated by the Court of Appeals:

> In analyzing a statute, we must always be cognizant of the fundamental principle that statutory construction is approached from a commonsensical perspective. Thus, we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense. Furthermore, we do not read statutory language in isolation or out of context but construe it in light of the legislature's general purpose and in the context of the statute as a whole. Context may include related statutes, pertinent legislative history and other material that fairly bears on the fundamental issue of legislative purpose or goal.

*Frost v. State*, 336 Md. 125, 137-38, 647 A.2d 106 (1994) (internal quotations, brackets, and citations omitted). The Court's rejection of an unyielding "plain meaning rule" is especially pertinent to our interpretation of our Chapter 6: "Even where the language of a statute is plain and unambiguous, we may look elsewhere to divine legislative intent; the plain meaning rule is not rigid and does not require us to read legislative provisions in rote fashion and in isolation." *Blaine v. Blaine*, 336 Md. 49, 64, 646 A.2d 413 (1994).

The preamble to Chapter 6 mentions "replacement players" – a term not used in the text of the statute but clearly meaning players signed to replace those on strike. Referring to a poll of Orioles' season ticket holders, the preamble cites overwhelming opposition to "the idea of the Orioles using replacement players instead of the current Orioles." The preamble also notes poll results indicating that "the overwhelming majority of season ticket holders believe that major league professional baseball should cancel the upcoming season rather than play with replacement players if fewer than 75% of the team's baseball players were baseball players on a major league professional baseball team in 1994." Thus, the preamble unmistakably links the "75%" threshold in the text of the statute to the public's distaste for replacement players and so to the strike

itself. Another paragraph of the preamble refers to certain losses at the University of Maryland's parking garages from "an extended strike."

The preamble is clear evidence that, in passing FI §13-723(b), the General Assembly's objective was to prevent the use of Camden Yards by teams fielding replacement players during a strike. Although a preamble is not a part of the statute itself, it is voted on as part of the bill and can be amended (indeed, was amended in Chapter 6), and the Court of Appeals gives a preamble considerable weight as evidence of the legislative objective. *See, e.g., Parrison v. State,* 335 Md. 554, 559, 644 A.2d 537 (1994); *McAlear v. McAlear*, 298 Md. 320, 344 n.26, 469 A.2d 1256 (1984); *Dillon v. State*, 277 Md. 571, 583, 357 A.2d 360 (1976).

Other material in the legislative history confirms this objective. In their bill analyses of Senate Bill 719, the jurisdictional committees noted as "background" to the bill the following: "Major league baseball players have been on strike since the middle of last season. The players' union and owners continue to talk without result.... The Orioles' owner is not in favor of replacement players. However, other teams are accepting replacement players at their spring training." The bill file also contains much other material reflecting the obvious point that Chapter 6 was enacted against the background of the strike and was intended solely to deal with one potential aspect of the strike, the use of replacement players.[5]

---

[5] For example, in a letter of advice written while the bill was pending, our office observed that, "[a]s major league players have struck in a dispute with team owners, the enactment of State legislation affecting the use of replacement players at Camden Yards raises the issue of whether the matter has been pre-empted by the [National Labor] Relations Act." Letter to Delegate Samuel I. Rosenberg and Senator John A. Pica, Jr., from Assistant Attorney General Richard E. Israel at 2 (February 21, 1995).

## III

### Conclusion

It would be inconsistent with the General Assembly's objective, and with common sense, to construe Chapter 6 as applying when a team is not using replacement players in lieu of striking players. The General Assembly never intended this bill to bar from Camden Yards a team that simply has an unusually high number of rookies, when there is no strike.

Thus, it is our opinion that Chapter 6 does not apply to games involving the Detroit Tigers (or any other team) when there is no strike by major league baseball players.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*